UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| Rosa Portillo, <br><br> Plaintiff, <br><br> — against — <br><br> Regal Entertainment, LLC and Regal Cinemas, Inc., <br><br> Defendants. <br><br>——————————————————— <br><br> Regal Entertainment, LLC and Regal Cinemas, Inc., <br><br> Third-Party Plaintiff, <br><br> — against — <br><br> ADG Maintenance Co., Inc., <br><br> Third-Party Defendant. | **17-cv-1873 (ARR) (VMS)** <br><br> **Not for print or electronic publication** <br><br> **Opinion & Order** |

ROSS, United States District Judge:

Third-party defendant ADG Maintenance Co., Inc. moves for summary judgment against defendants and third-party plaintiffs Regal Entertainment, LLC and Regal Cinemas, Inc. (collectively, "Regal"). Regal opposes.[1] For the reasons set forth below, ADG's motion for summary judgment is granted in part and denied in part.

## BACKGROUND

Regal operates a movie theater in Astoria, Queens, New York. *See* ADG's Rule 56.1

---

[1] The brief in opposition to summary judgment that third-party plaintiffs' counsel filed indicates that it is submitted on behalf of "Regal Cinemas," without mentioning Regal Entertainment, LLC. Mem. of Law in Opp. to Summ. J. Mot. 1, ECF No. 74. However, ADG has moved for summary judgment against both entities. *See* Notice of Mot. 1, ECF No. 69. Because neither party has provided me with any basis on which to distinguish between the two Regal entities, I assume that Regal's arguments in opposition to summary judgment apply equally to them both.

Statement ¶ 1, ECF No. 72 ("ADG 56.1"); Regal's Resp. to ADG's 56.1 ¶ 1, ECF No. 75 ("Regal 56.1"). Regal hired ADG as an independent contractor to provide janitorial services at this theater. *See* Independent Contractor Agreement ¶¶ 1.1–1.2, Risi Decl. Ex. H, ECF No. 70-8 (the "Contract"). ADG hired a subcontractor, Uruguay Cleaning Corporation, to clean the theater overnight; during the day and into the evening, Regal employees cleaned the theater. *See* ADG 56.1 ¶¶ 3, 20; Regal 56.1 ¶¶ 3, 20. The plaintiff, Rosa Portillo, worked for Uruguay as a cleaner. ADG 56.1 ¶ 3; Regal 56.1 ¶ 3.

On May 8, 2016, at approximately 2:00 AM, Portillo slipped and fell in a janitorial closet in the theater. ADG 56.1 ¶¶ 1, 5; Regal 56.1 ¶¶ 1, 5. At the time, Portillo's co-workers and some Regal employees were the only other people present at the theater. ADG 56.1 ¶ 4; Regal 56.1 ¶ 4. After arriving at the theater for her work shift, Portillo had gone to the janitorial closet to gather her cleaning supplies. ADG 56.1 ¶¶ 5, 7; Regal 56.1 ¶¶ 5, 7. The janitorial closet was locked, and Portillo did not know the entry code. ADG 56.1 ¶ 6; Regal 56.1 ¶ 6. Portillo testified that a man named Ascension, or Ascensión, opened the door to the closet for her. *See* First Portillo Dep. 37:16–21, 40:17–25, Risi Decl. Ex. D, ECF No. 70-4; Second Portillo Dep. 77:24–78:5, Risi Decl. Ex. E, ECF No. 70-5. Portillo's testimony first implied that Ascension worked for Regal. *See* First Portillo Dep. 37:16–19, 40:8–11. However, she later testified that Ascension worked for Uruguay. *See* Second Portillo Dep. 78:6–9, 101:10–15. An usher at the theater, Jonathan Orejuela, testified that only "us the workers"—possibly referring to Regal employees—knew the entry code. Orejuela Dep. 59:2–10, Risi Decl. Ex. F, ECF No. 70-6. Portillo also testified that, after she walked into the closet, she took four or five steps and then slipped on some soapy water and fell. First Portillo Dep. 43:4–12; Second Portillo Dep 79:25–80:13, 82:7–9; ADG 56.1 ¶ 9; Regal 56.1 ¶ 9. She described the soapy water as having a lemon color and a lemon scent. ADG 56.1 ¶ 10; Regal 56.1 ¶ 10.

After Portillo's fall, Orejuela found her sitting across from the janitorial closet as he walked down a hallway on his way to clock out at the end of his work shift. ADG 56.1 ¶ 11; Regal 56.1 ¶ 11. His shift ended at 2:30 AM. ADG 56.1 ¶ 18; Regal 56.1 ¶ 18. Orejuela testified at one time that he was on his way to clock out between 2:20 and 2:30 AM, Orejuela Dep. 13:18–22, and at another time that he encountered Portillo on his way to clock out between 2:00 and 2:30 AM, *id.* at 48:8–15. Before encountering Portillo, Orejuela had been cleaning in the theater's kitchen. ADG 56.1 ¶ 32; Regal 56.1 ¶ 32. Orejuela testified that he had been in the kitchen since before the last movie showing of the evening. Orejuela Dep. 94:23–95:8. He further testified that the last movie showing began at 12:30 or 12:50 AM. *See id.* at 14:2–6.

During the daytime, Regal employees accessed the janitorial closet in the course of their cleaning. ADG 56.1 ¶¶ 20, 23; Regal 56.1 ¶¶ 20, 23. Regal employees also typically accessed the janitorial closet around 1:00 AM, when they cleaned a two-wheel trash collection bin and left it for the Uruguay cleaning crew to use overnight. ADG 56.1 ¶¶ 22, 24, 26; Regal 56.1 ¶¶ 22, 24, 26. Regal employees cleaned this bin with a mixture of water and a cleaning product called "A-Tack," which ran through tubing connected to the sink faucet in the janitorial closet. ADG 56.1 ¶¶ 15, 25; Regal 56.1 ¶¶ 15, 25. Regal employees would then hose down the bin and tip it over in order to pour its contents into the sink in the closet. ADG 56.1 ¶ 25; Regal 56.1 ¶ 25. An A-Tack and water mixture looks like diluted bleach and has a lemon scent. ADG 56.1 ¶ 16; Regal 56.1 ¶ 16. Regal employees also cleaned two additional bins throughout the day in the same manner in which they cleaned the two-wheel bin. ADG 56.1 ¶ 28; Regal 56.1 ¶ 28. At the end of each overnight cleaning shift, Uruguay employees would clean the janitorial closet. ADG 56.1 ¶ 27; Regal 56.1 ¶ 27. On the day before Portillo's fall, Uruguay cleaners left the closet clean, with no water or soapy water on the floor. ADG 56.1 ¶ 27; Regal 56.1 ¶ 27.

The parties dispute the time at which Portillo and her Uruguay co-workers arrived at the theater that night. According to ADG, Portillo arrived at the theater between 1:50 and 2:00 AM, only shortly before her fall. ADG 56.1 ¶ 2. Portillo testified that each night, she reported to the theater at about 1:50 AM. Second Portillo Dep. 100:10–12. She later testified that, on the night of her fall, she arrived at the theater at 2:00 AM, which was the time at which she usually started her work shift. *Id.* at 107:10–16. She further testified that before she arrived at the theater at 2:00 AM, the only other people who would have been at the theater cleaning were Regal employees. *Id.* at 107:18–108:5. However, Regal asserts that Portillo must have been at the theater "for some time" before her fall. Regal 56.1 ¶¶ 2, 8. Orejuela testified that, although he did not know the time at which the Uruguay cleaners first arrived at the theater, he estimated that Portillo would have been at the theater for "a good hour" before her fall. Orejuela Dep. 58:6–14. In explaining the basis for this estimate, he testified that the Uruguay employees "start[ed] around the time where we close out all the theaters so I can't visually see them come in but they're expected to be there." *Id.* at 58:15–20. It is not clear at what time the Regal employees "close out all the theaters." However, Orejuela testified that Regal employees clean most of the theaters before the last showing of the night, *id.* at 24:11–13, which starts at 12:30 or 12:50 AM, *id.* at 14:5–6. Then, the Uruguay employees clean the theaters where the last showings had been held. *See id.* at 24:13–17. Orejuela further testified that Uruguay employees had already been "in and out of" the janitorial closet before Portillo's fall because "they already had supplies out when the incident happened." *Id.* at 59:2–17. These supplies included vacuum cleaners, extension cords, and a garbage bin. *See id.* at 59:18–21, 60:19–23. However, Orejuela did not actually see these supplies outside the closet until "after the accident happened." *Id.* at 60:6–10.

Portillo filed suit against Regal in New York state court, bringing personal injury claims.

4

*See* Notice of Removal 1, ECF No. 1; V. Compl. ¶¶ 123–52, ECF No. 1-1. Regal removed the case to this court on the basis of diversity jurisdiction. *See id.* ¶ 11. Regal then filed a third-party complaint against ADG. *See* Third-Party Compl., ECF No. 17. It asserts three causes of action: common law indemnity and contribution, contractual indemnity, and failure to procure insurance. *See id.* ¶¶ 8–19. ADG moves for summary judgment against the common law indemnity, contractual indemnity, and failure to procure insurance claims, interpreting the failure to procure insurance claim as a breach of contract cause of action. *See* Mem. of Law in Supp. of Mot. for Summ. J. 5–9, ECF No. 78 ("ADG Br.").[2] ADG has also filed a second third-party complaint against Uruguay, which is not at issue here. *See* Second Third-Party Compl., ECF No. 40.

## DISCUSSION

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The function of the court is not to resolve disputed issues but rather to determine whether there is a genuine issue to be tried. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). "While genuineness runs to whether disputed factual issues can 'reasonably be resolved in favor of either party,' . . . materiality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." *McPherson v.*

---

[2] Although ADG asserts that "the first cause of action in the third-party complaint should be dismissed[,]" it does not address the fact that the first cause of action is labeled "common law indemnity *and contribution*." ADG Br. 5; Third-Party Compl. ¶¶ 8–9 (emphasis added). ADG's argument with respect to the first cause of action focuses solely on common law indemnification. *See* ADG Br. 5. Thus, I do not understand ADG to be moving for summary judgment against a common law contribution claim, to the extent that Regal has asserted one. To the extent that Regal has asserted a claim for common law contribution, it survives this decision. Separately, I note that because ADG has filed a corrected version of its moving brief at ECF No. 78, I am disregarding the iteration of its moving brief that it mistakenly filed—and that is almost identical to its reply brief—at ECF No. 73.

*Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (alteration in original) (quoting *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996)).

In assessing whether summary judgment is appropriate, the court considers "the pleadings, depositions, answers to interrogatories and admissions on file, together with any other firsthand information including but not limited to affidavits." *Nnebe v. Daus*, 644 F.3d 147, 156 (2d Cir. 2011) (quoting *In re Bennett Funding Grp., Inc.*, 336 F.3d 94, 99 (2d Cir. 2003)); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The moving party carries the burden of demonstrating that there is no genuine dispute respecting any material fact and "may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223–24 (2d Cir. 1994). Once this burden is met, in order to avoid the entry of summary judgment, the non-moving party "must come forward with specific facts showing that there is a genuine issue for trial." *LaBounty v. Coughlin*, 137 F.3d 68, 73 (2d Cir. 1998) (citing *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525–26 (2d Cir. 1994)). In reviewing the record before it, "the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *McLee v. Chrysler Corp.*, 109 F.3d 130, 134 (2d Cir. 1997).

### I. Because the parties dispute whether Regal participated in the wrongdoing that led to Portillo's fall, summary judgment on the common law indemnification claim is denied.

The parties agree that New York common law governs here. *See* ADG Br. 5 (citing New York case law); Mem. of Law in Opp. to Summ. J. Mot. 2, ECF No. 74 ("Regal Br.") (acknowledging that ADG cited the correct common law indemnity standard). Because neither party has provided me with any reason to apply a different state's common law, nor have the parties provided me with sufficient facts to conduct a choice of law analysis, I assume that New York

common law governs. "Under New York law, the common law right to indemnification arises when one party is compelled to pay for the wrong of another." *Perkins Eastman Architects, P.C. v. Thor Eng'rs, P.A.*, 769 F. Supp. 2d 322, 329 (S.D.N.Y. 2011) (quoting *Westport Marina, Inc. v. Boulay*, No. 06 CV 5569 (DRH) (AKT), 2010 WL 4340343, at *4 (E.D.N.Y. Oct. 25, 2010)). A common law indemnification claim will lie only if the party from whom indemnity is sought "violated a duty owed to [the] plaintiff in the primary action." *Id.* (quoting *Dora Homes, Inc. v. Epperson*, 344 F. Supp. 2d 875, 894 (E.D.N.Y. 2004)). However, "the 'key element' of a common law indemnification claim 'is not a duty running from the indemnitor to the injured party, but rather is a separate duty owed the indemnitee by the indemnitor.'" *Id.* at 329–30 (quoting *Raquet v. Braun*, 681 N.E.2d 404, 407 (N.Y. 1997)). In addition, "a party who has itself participated to some degree in the wrongdoing cannot receive the benefit of the [common law indemnity] doctrine, but only of contribution." *Westport Marina*, 2010 WL 4340343, at *4 (alteration in original) (quoting *Durabla Mfg. Co. v. Goodyear Tire & Rubber Co.*, 992 F. Supp. 657, 660 (S.D.N.Y. 1998)); *see McCarthy v. Turner Constr., Inc.*, 953 N.E.2d 794, 801 (N.Y. 2011) ("[A] party cannot obtain common-law indemnification unless it has been held to be vicariously liable without proof of any negligence or actual supervision on its own part."); *Martins v. Little 40 Worth Assocs., Inc.*, 899 N.Y.S.2d 30, 32 (N.Y. App. Div. 2010) (citing *Correia v. Prof'l Data Mgmt., Inc.*, 693 N.Y.S.2d 596, 600 (N.Y. App. Div. 1999)) ("Common-law indemnification requires proof not only that the proposed indemnitor's negligence contributed to the causation of the accident, but also that the party seeking indemnity was free from negligence.").

Here, the parties dispute whether Regal participated in the wrongdoing that led to Portillo's slip and fall.[3] It is undisputed that on the day before Portillo's fall, Uruguay cleaners left the

---

[3] The parties do not address the other elements of the common law indemnification claim—

7

janitorial closet clean, with no liquid on the floor. ADG 56.1 ¶ 27; Regal 56.1 ¶ 27. During the day and evening leading up to the Uruguay cleaners' overnight shift on the night at issue, Regal employees accessed the janitorial closet; in particular, Regal employees would have cleaned trash collection bins with an A-Tack solution, hosed down those bins, and poured their contents into the sink in the janitorial closet. ADG 56.1 ¶¶ 15, 20, 22–26, 28; Regal 56.1 ¶¶ 15, 20, 22–26, 28. On ADG's view of the remaining pertinent facts, it seems likely, though not definitive, that a Regal employee was responsible for spilling the liquid on the floor of the janitorial closet. Orejuela's testimony implies—albeit weakly—that only Regal employees knew the code that unlocked the janitorial closet. *See* Orejuela Dep. 59:2–10. Portillo arrived at the theater between 1:50 and 2:00 AM and, after taking four or five steps into the janitorial closet, slipped and fell at some time close to 2:00 AM. *See* ADG 56.1 ¶¶ 1, 9; Regal 56.1 ¶¶ 1, 9; First Portillo Dep. 43:4–12; Second Portillo Dep 79:25–80:13, 82:7–9, 107:10–16, 100:10–12. These facts suggest that Regal employees had ample opportunity throughout the day to spill liquid on the floor of the janitorial closet and that Portillo herself had little, if any, opportunity to cause a spill. However, other facts in the record permit the conclusion that a Uruguay employee, and not a Regal employee, caused the spill. Portillo testified that Ascension—whom she at one time identified as a Uruguay employee— unlocked the janitorial closet for her. *See* First Portillo Dep. 37:16–21, 40:17–25; Second Portillo Dep. 77:24–78:9, 101:10–15. If a Uruguay employee knew the code that unlocked the closet, then a Uruguay employee could have entered the closet at some time before Portillo arrived and spilled the liquid. Further, Orejuela estimated that the Uruguay employees would have been at the theater for "a good hour" before Portillo's fall. Orejuela Dep. 58:6–20. The basis for this estimate is not entirely convincing. It depends, in part, on Orejuela's assumption that Uruguay employees had

---

whether ADG violated a duty to Portillo or owed Regal a duty to indemnify.

8

already removed cleaning equipment from the closet before Portillo's fall, when, in fact, he did not see that equipment outside the closet until up to half an hour after her fall, and, in another part, on his vague calculation based on when the Regal employees "close out all the theaters[.]" *Id.* at 13:18–22, 48:8–15, 58:15–20, 59:2–21, 60:6–23. Still, even ADG's own timeline leaves some opportunity for a Uruguay employee to have caused the spill, as Portillo's arrival between 1:50 and 2:00 AM certainly does not preclude another Uruguay employee from having arrived minutes earlier and spilled the liquid before Portillo entered the closet.

In short, the record reveals a genuine dispute of material fact. On the facts that the parties have presented, a jury could reasonably resolve the issue of whether Regal participated in the wrongdoing that led to Portillo's fall in favor of either party. *See McPherson*, 174 F.3d at 280. Thus, I deny summary judgment on the common law indemnification claim, and the first cause of action in the third-party complaint survives.

## II. To the extent that Regal asserts a breach of contract claim, I grant summary judgment to ADG because Regal has provided no evidence that shows that ADG did not comply with its contractual obligation to procure insurance.

Regal labeled the third cause of action in its third-party complaint "Failure to Procure Insurance." Third-Party Compl. ¶¶ 16–19. ADG interprets this cause of action as a breach of contract cause of action. *See* ADG Br. 5–6. Indeed, Regal alleges that, "[u]pon information and belief, pursuant to the contract, ADG . . . was obligated to procure general liability insurance, for its work at the premises, and that insurance was to name Regal Entertainment, LLC and Regal Cinemas, Inc. as an additional insured." Third-Party Compl. ¶ 17. Regal also alleges that, if ADG did not obtain the insurance coverage that the contract between the parties required it to obtain, or if ADG did not name Regal as an additional insured, then ADG "will be liable to [Regal] for the amount of any judgment that the plaintiff may recover against [Regal] together with all costs,

9

disbursements, expenses and attorneys' fees for this action." *Id.* ¶ 19. As part of the same cause of action, but without alleging that ADG breached any contractual obligation, Regal also asserts that "[i]f the plaintiff recovers a judgment against [Regal], then ADG . . . shall be obliged to pay such judgment or reimburse [Regal] up to the amount of the limits of the liability insurance policy which ADG . . . was obliged to procure and maintain." *Id.* ¶ 18.

The uncontested evidence shows that ADG did obtain insurance coverage and that the contract between ADG and Regal did not, on its face, require that insurance policy to name Regal as an additional insured. ADG obtained an insurance policy that was effective from February 5, 2016 until February 5, 2017—including May 8, 2016, the date of Portillo's fall. *See* Insurance Policy 1, Risi Decl. Ex. I, ECF No. 70-9; Young Decl., ECF No. 71. The contract between Regal and ADG provides that "[ADG] represents that [ADG] has obtained appropriate insurance coverage to cover any acts or omissions committed by [ADG] or any of [ADG's] representatives during the performance of the Services. [ADG] agrees to furnish Regal with proof of such insurance coverage prior to the beginning of work." Contract § 1.13. Regal has submitted no evidence to dispute these facts. Rather, it argues—without citation—that "ADG did not obtain insurance coverage to cover this accident as ADG's insurer has denied additional insured coverage to Regal in this case." Regal Br. 4. First, this conclusory argument cannot defeat ADG's motion for summary judgment, which ADG has supported with evidence of the insurance coverage that it obtained. *See Transflo Terminal Servs., Inc. v. Brooklyn Res. Recovery, Inc.*, 248 F. Supp. 3d 397, 399 (E.D.N.Y. 2017) ("Conclusory statements, devoid of specifics, are insufficient to defeat a properly supported motion for summary judgment."); *see also* Fed. R. Civ. P. 56(c)(1). Second, even assuming that Regal had offered some evidentiary support for its argument here, Regal has not explained how, if at all, the fact that ADG's insurer "denied additional insured coverage to

Regal" amounts to a breach on ADG's part of its contractual obligation to obtain insurance coverage in the first place. Thus, to the extent that Regal asserts a breach of contract claim based on ADG's alleged failure to obtain the contractually required insurance coverage, I grant summary judgment to ADG on that claim. I do not decide here whether, if Portillo ultimately recovers against Regal, ADG will be obligated to pay the judgment or reimburse Regal up to the limit set forth in the insurance policy, as the parties have not briefed this issue. *See* Third-Party Compl. ¶ 18.

### III. I deny summary judgment on the contractual indemnification claim based on the same disputes of fact that surround the common law indemnification claim.

First, Tennessee law governs the contractual indemnification claim based on the terms of the parties' contract. In their contract, Regal and ADG agreed that the contract "shall be construed and interpreted in accordance with the laws of the state of Tennessee." Contract § 6.6. The parties now agree that, accordingly, Tennessee law should govern my analysis of the contractual indemnification claim. *See* ADG Br. 6–9 (acknowledging that "Regal has taken the position that Tennessee law, as provided in § 6.6 of the contract, governs" without disputing that Tennessee law governs and proceeding to apply Tennessee law); Regal Br. 3 (applying Tennessee law). In addition, New York's choice of law rules favor applying the law that the parties contractually agreed would apply. *See In re Coudert Bros. LLP*, 673 F.3d 180, 186 (2d Cir. 2012) ("It is well established that a federal court sitting in diversity must generally apply the choice of law rules of the state in which it sits."). New York courts generally "enforce a choice-of-law clause so long as the chosen law bears a reasonable relationship to the parties or the transaction[.]" *Welsbach Elec. Corp. v. Mastec N. Am., Inc.*, 859 N.E.2d 498, 500 (N.Y. 2006) (citing *Cooney v. Osgood Mach., Inc.*, 612 N.E.2d 277, 279 (N.Y. 1993)). Here, the Notice of Removal indicates that Regal Cinemas, Inc. is a Tennessee corporation and has its principal place of business in Tennessee, although the parties have not cited any evidence to support this assertion. Notice of Removal ¶ 12.

11

Absent any argument to the contrary, I assume that Tennessee law does bear a reasonable relationship to the parties. Further, although New York courts will decline to enforce an illegal agreement or to apply a foreign law that violates New York public policy to such an extent that it is "truly obnoxious[,]" I have no reason to believe that either of these exceptions applies here. *Welsbach*, 859 N.E.2d at 500–01. Thus, I apply Tennessee law.

Under Tennessee law, a court should interpret a contract by "ascertain[ing] the intention of the parties based upon the usual, natural, and ordinary meaning of the contractual language." *Teter v. Republic Parking Sys., Inc.*, 181 S.W.3d 330, 342 (Tenn. 2005) (quoting *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999)). "If a contract's language is clear and unambiguous, then the literal meaning of the language controls the outcome of the contract dispute." *Id.* Further, "all provisions in the contract should be construed in harmony with each other, if possible, to promote consistency and to avoid repugnancy between the various provisions of a single contract." *Id.* (quoting *Guiliano*, 995 S.W.2d at 95). In addition, "a contract of indemnity will not be construed to indemnify the indemnitee against losses resulting from his own negligent acts unless such intention is expressed in clear and unequivocal terms, [o]r unless no other meaning can be ascribed to it." *Kellogg Co. v. Sanitors, Inc.*, 496 S.W.2d 472, 474 (Tenn. 1973) (quoting 41 Am. Jur. 2d *Indemnity* § 13).

Here, the parties' contract provides—in a section labeled "Indemnification"—that:

> [ADG], at its sole expense, shall indemnify, defend, and hold Regal, its affiliates, agents, and employees, harmless against all liability or loss, all costs, fees, and penalties, and against all claims or actions including, but not limited to, claims of . . . injury or death of persons . . . arising out of (1) the acts or omissions of [ADG], its employees, agents, or subcontractors in connection with [ADG's] services pursuant to this Agreement, (2) any breach of its representations or warranties contained in this Agreement, or (3) any breach of its obligations pursuant to this Agreement.

Contract § 4.1. In a different section titled "Performance of Services[,]" the contract provides that

12

"[ADG] agrees that Regal shall not incur any obligation or liability to any third party as a result of [ADG] performing the Services." *Id.* § 1.8. The contract defines "Services" by way of an extensive list that includes, for example, mopping, vacuuming, dusting, and emptying trash cans. *Id.* § 1.2; Schedule A, Contract at 6.

The parties dispute facts that are central to the determination of whether Regal can claim the benefit of contractual indemnification here. First, as addressed above in Discussion Section I, whether Regal was negligent leading up to Portillo's slip and fall is a disputed issue. Thus, I do not need to decide whether to construe the parties' contract as ADG urges me to construe it—as precluding Regal from claiming indemnification for its own negligence. *See* ADG Br. 9. Assuming, without deciding, that ADG is interpreting the contract correctly, the parties' dispute as to whether Regal was, in fact, negligent would still preclude me from granting summary judgment to ADG. Second, the contract states that ADG will indemnify Regal against personal injury claims "*arising out of* . . . the acts or omissions of [ADG or its] . . . subcontractors *in connection with [ADG's] services* pursuant to this Agreement[.]" Contract § 4.1 (emphasis added). Accordingly, the contract unambiguously provides that, for Regal to benefit from contractual indemnification, (1) the personal injury claim asserted against it must arise out of an act or omission of ADG or Uruguay, and (2) that act or omission must have a connection to the contractual Services. Again, as addressed above in Discussion Section I, the parties dispute whether Portillo's claim arises out of an act or omission of Uruguay. On the record before me, a jury could reasonably find that a Regal employee was solely responsible for the spill, and that no act or omission on Uruguay's part played any role in Portillo's fall. However, a jury could also reasonably find that a Uruguay employee spilled the liquid onto the floor, in which case some act or omission on Uruguay's part—perhaps in connection with the performance of a contractually-

13

specified cleaning Service—would have given rise to Portillo's claim. Similarly, the contract also provides that "Regal shall not incur any obligation or liability to any third party *as a result of [ADG] performing the Services*." Contract § 1.8 (emphasis added). Here, too, a jury could reasonably find for either party, as the parties dispute whether Regal's potential liability to Portillo is a result of ADG's performance of Services. If a Regal employee was solely responsible for the spill—after the Uruguay employees had left the janitorial closet clean the night before, and before they had begun cleaning at all on the night at issue—then Portillo's claim would not seem to result from ADG's performance of Services. If, however, the Uruguay employees had already begun their work for the night, or a Uruguay employee spilled the liquid, a jury could find that Portillo's claim resulted from ADG's performance of Services.[4]

    The parties both raise flawed arguments in connection with the contractual indemnification claim. ADG's argument that Portillo "was not performing any of the defined 'Services' when her accident occurred"—and that, accordingly, Regal cannot benefit from contractual indemnification—is misplaced. ADG Br. 7. Broadly speaking, the contract requires some connection to the performance of Services by ADG or Uruguay as a prerequisite to indemnification—and not that Portillo herself must have been in the middle of performing a particular Service when she fell. However, Regal is also incorrect to assert that the contract provides for indemnification against "all liability or loss[,]" and "all claims or actions." Regal Br. 3. In making this assertion, Regal has truncated the indemnification clause, which provides for

---

[4] The contract also provides that ADG will indemnify Regal against a personal injury claim arising out of "any breach of [ADG's] representations or warranties contained in this Agreement, or . . . any breach of [ADG's] obligations pursuant to this Agreement." Contract § 4.1. Even if, on the facts before me, I could determine that ADG breached some contractual obligation, representation, or warranty—which I cannot—such a finding would only further preclude summary judgment in favor of ADG. Thus, it is not necessary for me to analyze this issue.

14

indemnification "against all liability or loss . . . and against all claims or actions . . . *arising out of*" ADG's or its subcontractor's acts or omissions in connection with ADG's services, or ADG's breach of its contractual representations, warranties, or obligations. Contract § 4.1 (emphasis added). Notwithstanding these arguments from the parties, the disputes of fact set forth above preclude summary judgment in ADG's favor on the contractual indemnification claim.

## CONCLUSION

For the reasons set forth above, I deny summary judgment on the common law indemnification and contractual indemnification claims. Therefore, the first and second causes of action asserted in the third-party complaint survive this decision. To the extent that the third cause of action asserts a breach of contract claim based on ADG's alleged failure to procure insurance, I grant summary judgment to ADG on that claim, and it is dismissed. Finally, I note that this case is one that likely should be amenable to negotiated resolution without further expenditure of resources in pretrial preparation and trial. Especially given the difficulty in resolving the primary factual issue remaining in this lawsuit—the issue of which party was responsible for spilling, or perhaps failing to clean up, the liquid on which Portillo slipped—I strongly encourage the parties to seek a negotiated resolution in this case.

SO ORDERED.

_____/s/_____
Allyne R. Ross
United States District Judge

Dated:   July 28, 2020
      Brooklyn, New York